**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **THOMAS PETROLEUM, LLC, d/b/a EASTERN SIERRA OIL,** | **1:11-CV-00902-LJO-JLT** |
| **Plaintiff,** | **ORDER RE PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION/SUMMARY JUDGMENT (DOC. 22)** |
| **v.** | |
| **KENNETH LLOYD, an individual, E.S. OIL, LLC, a California limited liability company, and DOES 1-30, inclusive,** | |
| **Defendants.** | |

## I. INTRODUCTION

This case involves a commercial dispute between Plaintiff Thomas Petroleum ("Thomas Petroleum" or "Thomas"), a Texas-based petroleum products distributor doing business in Bishop, California under the name "Eastern Sierra Oil," and one of its former employees, Kenneth Lloyd ("Lloyd"), who founded a company named "E.S. Oil," which is also involved in the petroleum products business in Bishop. Before the Court for Decision is Thomas Petroleum's motion for summary "adjudication"[1] on its First (Racketeer and Influenced Corrupt Organizations Act), Third (duty of loyalty), Fifth (unjust enrichment), Seventh (intentional interference with existing and prospective economic advantage), Eighth (conversion), Ninth (unfair competition), Fifteenth (federal trademark),

---

[1] Although Thomas Petroleum requests "adjudication" it in fact appears to be moving for summary judgment as to all of the claims raised in this motion. Its notice of motion, for example, argues it is "entitled to judgment as a matter of law" on each cause of action. Nowhere in either its notice or motion does Plaintiff request separate adjudication of facts or of elements of particular claims.

Seventeenth (federal unfair competition based on trademark), Eighteenth (state law trademark

infringement), and Twentieth (state law unfair competition based on trademark infringement). Doc. 22.

Defendant opposed the motion. Doc. 28. Plaintiff replied. Doc. 41. The parties submitted a joint

statement of undisputed fact, separate statements of fact, and numerous evidentiary objections. The

matter was originally set for hearing on August 21, 2012, but the hearing was vacated and the matter

submitted for decision on the papers pursuant to Local Rule 230(g). Doc. 24.

## II. <u>BACKGROUND</u>[2]

A.    <u>Thomas Petroleum's Relationship to Bishop and Lloyd.</u>

In October 2009, Thomas Petroleum purchased the assets of Haycock Petroleum Company

("Haycock"). Joint Statement of Undisputed Fact ("JSUF") ## 1-2.[3] Haycock had been engaged in

business in Bishop, California, under the name "Eastern Sierra Oil" since 1996. JSUF #2. As part of the

sale, Thomas Petroleum acquired the right to do business under that name and assumed Haycock's lease

in Bishop on a month-to-month tenancy. JSUF ## 2, 4.

Thomas Petroleum also retained all of Haycock's employees, including Lloyd. JSUF #5. Starting

in October 2009, Lloyd was Thomas Petroleum's Terminal Manager in Bishop, the highest-ranking

employee there. JSUF #6. Lloyd supervised five employees and oversaw budgets, sales, day-to-day

operations, management, safety, inventory, facility upkeep, and maintenance. JSUF ##8-9. He was also

involved in decisions about how to draft bids to potential customers or for potential projects, and about

---

[2] The facts set forth in this Background section are taken from the joint statement of undisputed facts, undisputed facts submitted by Plaintiff, and the admissible factual submissions of the non-moving parties.

[3] Plaintiff submitted a Joint Statement of Fact, which Defendants reviewed and to which Defendants agreed. *See* Doc. 22-3. Defendants now object to certain statements contained therein as irrelevant. As a threshold matter, Plaintiff argues that Defendants cannot object to a joint statement of facts to which Defendants agreed. Although there is considerable logic to this argument, Defendant had no way of knowing at the time it agreed to the veracity of the facts whether or not they would be relevant to (and therefore admissible for purposes of) Plaintiff's motion for summary judgment. Defendants are entitled to object to the relevance of these facts. However, the objections are unfounded. Relevance requires only that the evidence have "any tendency to make a fact more or less probable than it would be without the evidence"; and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The Court has carefully considered the Joint Statement of Undisputed Facts and to the extent it has relied upon any of its content has deemed that content relevant to the elements of one or more of Plaintiff's claims.

which customers to target in Bishop. JSUF #11. One of Lloyd's key duties was drafting and submitting

bids, and he had authority to enter into contracts on Thomas Petroleum's behalf. JSUF ##10-11. Lloyd

was a long-standing member of the small Bishop community and has been involved in the oil and gas

business there since he was a teenager. Lloyd Decl., Doc. 36, ¶¶ 2-5.

Once Thomas Petroleum took over Haycock's business operations in Bishop, Lloyd "became

unhappy with the way the company was run for a variety of reasons." *Id*. at ¶ 12. Among other things,

Lloyd believed "his skills, experience, and local goodwill were rarely, if ever, acknowledged by the

company, and my advice about how to proceed with negotiating deals was frequently ignored." *Id*. at ¶

13.

**B.**      **Lloyd's Creation of E.S. Oil, LLC.**

While still employed at Thomas Petroleum, Lloyd created "E.S. Oil, LLC" through an online

legal service. *Id*. at ¶ 14. Lloyd "was aware that advantages would be available for certain kinds of

governmental contracts if the company could qualify as having sufficient ownership interest held by

women, so [he] structured the company with [his] daughter as the largest single holder of equity." *Id*. He

created the company "without any particular idea of what (if anything) [he] would do with [it]." *Id*.

Lloyd's frustration level with Thomas rose and fell and he likewise "ran hot and cold" on the idea of

using E.S. Oil to "strik[e] out on [his] own." *Id*. at ¶ 15.

**C.**      **The Bishop Paiute Indian Tribe Deal.**

In early 2010, Lloyd proposed to his superiors at Thomas, John Saxon and Steve Moore, that

Thomas negotiate with the Bishop Paiute Indian Tribe to expand the Tribe's retail gasoline operations.

There was initial interest in a deal, but Lloyd was informed by his superiors that Thomas wanted a long-

term deal with the Tribe, while Tribal representatives informed Lloyd that the Tribe was not interested

in a long term deal.[4] *Id.* at ¶¶ 23-25. Negotiations continued for several weeks, but stagnated later that year. *Id.* at ¶¶ 25-28.

According to Lloyd, he "undertook to avoid contact with the Tribe" for some time, because the Tribe was asking questions about approximately $300,000 in sales and excise taxes withheld by Thomas' predecessor (Haycock). The Tribe claimed it was entitled to that money and requested information from Thomas Petroleum via Lloyd. When Lloyd requested direction from Thomas, he was told "not to answer the Tribe's questions." *Id.* at ¶¶ 25-26. In addition to this monetary dispute, the Tribe was distracted from any potential deal because it began to explore the possibility of building a Wal-Mart store with a gas station attached. *Id.* at ¶ 27. According to Thomas, Lloyd stopped talking about the project with anyone at Thomas, claiming a "lack of communication." Plaintiff's Statement of Undisputed Fact ("PSUF") #7.

In the fall or winter of 2010, after the Wal-Mart negotiations reached a dead end, Lloyd informed Thomas that there might be a possibility to re-open negotiations. *Id.* at ¶ 28. However, according to Lloyd, Thomas was still only interested in negotiating a long term deal, which was at odds with the Tribe's negotiating stance. *Id.* Believing there was no possibility of a deal between the Tribe and Thomas Petroleum, Lloyd negotiated a short-term deal with the Paiute tribe on behalf of his own company: E.S. Oil. Lloyd claims he did not sign onto any such deal until after he resigned from Thomas Petroleum in May 2011. Lloyd Delc. at ¶ 31. However, undisputed evidence indicates the Paiutes considered resolutions related to the E.S. Oil contracts on April 14, 2011 and signed the contracts the following week, all before Lloyd's resignation. JSUF ## 40-42.

**D.    The Los Angeles Department of Water and Power Deal.**

In January or February 2011, the Los Angeles Department of Water and Power ("LADWP")

---

[4] Specifically, Lloyd declares that "Michael Lumsden had made clear to me that the Tribe would not agree to any such contract." Lloyd Decl. at ¶ 23. Plaintiff objects to this piece of evidence on the ground that it is hearsay. Although Lloyd's statement that Lumsden told him of the Tribe's position is hearsay and cannot be admitted for its truth, it may be considered to establish Lloyd's state of mind, motive, knowledge and/or belief. Am. Jur. Evid. §§ 674, 676.

informed Lloyd that LADWP was soliciting bids for an upcoming project. JSUF #51. Lloyd recommended that Thomas should bid on the project, number 242. JSUF #52. Prior to this, Thomas Petroleum had been standing in the shoes of its predecessor, Haycock, under an earlier LADWP contract. Lloyd Decl. at ¶ 35.[5] LADWP was Thomas Petroleum's second-largest customer in Bishop. JSUF #49.

It is undisputed that Lloyd previously crafted and submitted five successful LADWP bids on behalf of Thomas Petroleum's predecessors. JSUF #54. Lloyd drafted a bid on Thomas Petroleum's behalf for bid 242. JSUF #58. Lloyd used Thomas Petroleum equipment and letterhead to email, fax, and send letters to numerous subcontractors regarding the bid. *Id*. He drove to and attended a pre-bid conference in Los Angeles. *Id*. In taking these steps, he purported to represent Thomas Petroleum and act on its behalf. JSUF #59.

However, Lloyd did not submit the bid for Thomas Petroleum. JSUF #61. Instead, he and his daughter (the President of E.S. Oil) signed the $1.15 million bid and submitted it for E.S. Oil. JSUF #63-65. The parties dispute whether the bid submitted on behalf of E.S. Oil utilized and/or attached pricing information from previous bids prepared by Thomas Petroleum. PSUF#18 and Objections (*see* Doc. 43).

According to Lloyd, LADWP is "very particular about certain things in the bidding process," including "that an officer of the business entity submitting the bid sign it, and that the bid be sealed [i.e. that it bear a corporate seal] or otherwise contain some indication that the corporation (or other business entity) is binding itself to the terms of the bid." Lloyd Decl. at ¶ 38. Without these things, LADWP is likely to reject the bid before even considering its content. *Id*.

Lloyd claims to have prepared the bid for this business "using [his] own knowledge of the oil industry, the local markets and available subcontractors, and a variety of other information known to me personally." *Id*. at ¶ 41. He claims he "did not need to, and did not, consult nearly any of Thomas

---

[5] Thomas Petroleum objected to other portions of this paragraph, but not to this fact.

Petroleum's proprietary information" to prepare the bid because he "did not need to" do so. *Id*. (emphasis added). To the extent Lloyd did consult Thomas Petroleum's confidential material, it was "largely as a convenience rather than a matter of necessity," as he has been "preparing functionally the same bid for LADWP's business, in previous versions since the late 1980s." *Id*. at ¶ 41.

Initially, Lloyd contacted Steve Moore to secure the signature of Cliff Thomas, Thomas Petroleum's CEO and majority equity owner, for the LADWP bid. *Id*. at ¶ 42. According to Lloyd, Moore instructed Lloyd to sign the bid himself. *Id*. Lloyd indicated that his would result in rejection by LADWP. *Id*.[6]. Moore responded that Lloyd should sign it "Haycock Petroleum DBA Eastern Sierra Oil." *Id*. Lloyd again indicated that this would result in the bid being rejected. *Id*.

Likewise, Lloyd told Moore that a corporate seal was needed. *Id*. at ¶ 44. According to Lloyd, Moore responded that Thomas Petroleum had no seal and that Lloyd "could maybe get a logo off a cereal box or words to that effect." *Id*. Lloyd interpreted these communications as indications that Mr. Moore did not take the process seriously. *Id*.

Lloyd claims to have continued to pursue Moore's assistance with securing appropriate signatures for the LADWP bid throughout 2011. *Id*. at ¶ 45. Because Moore repeatedly failed to assist Lloyd, Lloyd interpreted this as an indication that Thomas Petroleum did not want to compete for the business. *Id*. As a result, Lloyd prepared a bid on behalf of E.S. Oil. *Id*. at ¶ 46. Lloyd claims to have prepared this one entirely on his own time. *Id*. Lloyd also claims to have "waited until the day of the submission deadline" to submit the bid on behalf of E.S. Oil, LLC, hoping until that time to receive appropriate signatures from Thomas Petroleum. *Id*. at 48.

_____

[6] Thomas Petroleum objects to this portion of Lloyd's Declaration on the ground that Lloyd lacks personal knowledge of the general or specific reasons LADWP accepts or rejects bids. Doc. 44 at #50. This objection is OVERRULED. Lloyd claims to have such personal knowledge. Whether or not he actually does is a matter for the trier of fact. Thomas Petroleum also objects on hearsay grounds, arguing that "any knowledge [Lloyd] may have about the reasons underlying the LADWP's decisions to accept or reject a bid can only have come from inadmissible hearsay." *Id*. This objection is OVERRULED for the same reason the previous hearsay objection was rejected. This is being offered to demonstrate Lloyd's understanding or belief, not to demonstrate that it is true.

**E.**     **Communications with Nella Oil.**

It is undisputed that Lloyd reached out to Thomas Petroleum's direct competitor Nella Oil in February 2011 to say he was thinking about "going out on his own." Deposition of Bob Prary at 30-31.[7] In March 2011, Lloyd met with senior managers at Nella to set up an account for E.S. Oil. JSUF #44-45. Several weeks before Lloyd resigned in early May 2011, Lloyd informed Nella he would send Nella a "list of top customers" and the contract Lloyd now had with the Paiute Tribe. JSUF #46. Lloyd's contact at Nella informed Lloyd that Nella would not formally establish credit with Nella until Lloyd resigned from Thomas Petroleum to prevent "any issues." JSUF #47.

**F.**     **The Bishop Facility Lease.**

As Terminal Manager, Lloyd was Thomas Petroleum's main contact with its landlord in Bishop. JSUF #67. It is undisputed that in October 2011, Lloyd informed the landlord that he was working on "finalizing" a "deal" to buy Eastern Sierra Oil from Thomas Petroleum, and asked her to draft a lease that would remove Thomas Petroleum as tenant and substitute in "E.S. Oil." PSUF ## 21-22. Lloyd admits that no such deal existed. PSUF #23.

It is also undisputed that Lloyd asked the landlord to communicate with him about the lease via his private email address and to send the lease to his attention, because he "didn't want anyone else at Thomas Petroleum to see a lease coming in with the tenant being E.S. Oil, LLC" for fear this might get him fired. PSUF ## 24-25.

From 2002 to December 2010, Thomas petroleum was the tenant on the Bishop facility lease and paid $2,387 per month in rent. JSUF # 70. Lloyd's daughter signed a lease between the landlord and E.S. Oil in late November to be effective January 1, 2011, with rent set at $2,400 per month. JSUF #68. From January to May 2011, Thomas Petroleum continued to pay $2387 per month, while E.S. Oil made up the $13 per month difference. JSUF #71. In May 2011, Thomas Petroleum negotiated a new ten-year

---

[7] It is disputed whether Lloyd went further at this time to inform Nella that he was in fact "breaking away." PSUF # 11 and objections thereto.

lease with the landlord, which set rent at $2,400 per month, with a two percent annual escalation clause. JSUF #73.

**G.    Lloyd's Departure from Thomas Petroleum**

By late April 2011, Lloyd concluded his "relationship" with Thomas could not be salvage and he decided to make an offer to purchase Thomas' Bishop operation. Lloyd Decl. *¶ 15*. If that did not work, Lloyd was determined to "strike out on [his] own." *Id*. On April 27, Lloyd called a mandatory all-staff meeting. JSUF #75. After making all employees sign a "non-disclosure agreement," Lloyd told them he was unhappy working for Thomas Petroleum and was going to offer to buy the business from Thomas. *Id*. It is undisputed that when asked what would happen if Thomas Petroleum did not agree to the sale, Lloyd stated that Thomas Petroleum's biggest customers would "go away," specifically naming the Paiute Tribe and LADWP. JSUF #76. Lloyd drew a chart resembling a hockey stick, explained that a few customers (10%) account for the majority of profits (90%), and said he would "focus his attention" on and "go after" those top customers. JSUF #77.

On May 4, 2011 Lloyd resigned. JSUF #14. On the same day, Lloyd made an offer to buy out Thomas' Bishop business, but was rebuffed. Lloyd Decl. at ¶ 14. Eight days later, the Paiute Tribe began doing business with E.S. Oil. JSUF ## 79, 83. On July 1, 2011 LADWP granted bid 242 to E.S. Oil. LADWP terminated its fuel business with Thomas Petroleum in September 2011, when its previous contract expired, and E.S. Oil began deliveries to LADWP. JSUF #80-83.

**III. <u>STANDARD OF DECISION</u>**

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

8

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence" to support the non-moving party's case. *Id*. When the moving party meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material facts by either:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984.

# IV. ANALYSIS

## A.     Duty of Loyalty (Cause of Action 3).

The elements of a cause of action for breach of a duty of loyalty are well established: "(1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007). The first element is satisfied here, as "an employer has the right to expect the undivided loyalty of its employees. The duty of loyalty is breached, and may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer." *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (1995); *Fowler v. Varian Associates, Inc.,* 196 Cal. App. 3d 34, 41 (1987). [8]

Thomas Petroleum requests summary judgment on its breach of duty of loyalty claim.  Doc. 22-1. at 9-11. Specifically, Thomas Petroleum asserts that Lloyd performed "extensive acts" that were "inimical to Thomas Petroleum's best interests…." *Id*. at 10. Generally, those acts include: (1) Competing for and stealing two of Thomas Petroleum's biggest clients, the Paiute Tribe and LADWP; (2) assisting Thomas Petroleum's biggest competitor, Nella, by diverting business from Thomas Petroleum to Nella; and (3) secretly substituting E.S. Oil for Thomas Petroleum as tenant on its lease and allowing Thomas Petroleum to pay more than ninety percent of the rent. *Id*. at 10.

## 1.     The Paiute Tribe and LADWP Opportunities.

As a threshold matter, California law permits an employee to seek other employment and even to make some "preparations to compete" before resigning. *Fowler*, 196 Cal. App. 3d at 41. An employee may set up a competing organization without breaching the duty of loyalty. *See Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 345-47 (1966); *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 719-20 (2008). It was therefore not a *per se* breach of the duty of loyalty for Lloyd to set up E.S. Oil. The

---

[8] This is despite the fact that Lloyd claims "[n]o one from Thomas ever told [him] that [he] was a fiduciary of the company." Lloyd Decl. at ¶ 13. The law does not require such specific notice. The duty arises from the employer-employee relationship.

question is whether Lloyd otherwise acted unlawfully.

The duty of loyalty does not preclude an employee from engaging in all outside business pursuits. An employee may conduct "a business enterprise independent from, though similar to, that conducted by" his or her employer, so long as the employee acts in good faith and does not "seize ... business opportunities in the company's line of activities which the company has an interest and prior claim to obtain...." *Industrial Indem. Co. v. Golden State Co.*, 117 Cal. App. 2d 519, 533 (1953*); see also* Cal. Lab.Code § 2863 ("An employee who has any business to transact on his own account, similar to that intrusted to him by his employer, shall always give the preference to the business of the employer"); 3 Witkin, Summary 10th (2005) Agency, § 100, p. 1473. An employee may not "transfer his loyalty to a competitor." *Stokes*, 41 Cal. App. 4th 285, 295 (1995).

The Restatement (Second) of Agency, section 393, provides generally that "unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." But, the devil is in the details. *"In the usual case, it is the agent's duty to further his principal's interests even at the expense of his own in matters connected with the agency." Id*. at § 393(b). For example, "an agent employed to purchase a particular piece of land must not purchase it on his own account as long as it is possible to purchase it for the principal." *Id*. However, it is not wrongful for him to purchase such land for himself if he cannot purchase it for the principal on terms which the principal is willing to make after learning the facts." *Id*.

The critical question in this case is whether Lloyd's actions in connection with the Paiute and LADWP deals constituted unlawful competition by an employee or legitimate business activities to capture opportunities of which the employer was either unwilling or unable to take advantage. As to both the Paiute and LADWP opportunities there are material facts in dispute that preclude summary judgment.

### a.     Paiute Tribe Deal.

It is Plaintiffs' position that Lloyd breached his duty of loyalty to Thomas Petroleum in connection with the Paiute Tribe deal by, among other things, misrepresenting to Thomas Petroleum that the project was not viable due to "lack of communication" with the Paiutes "secretly" working to set up a deal between E.S. Oil and the Paiute Tribe. Lloyd tells a very different story. He describes proposing to his superiors at Thomas Petroleum the idea of entering into a business arrangement with the Paiute Tribe to expand the Tribe's retail gasoline operations through the creation of a set of diesel and ethanol storage tanks. Lloyd Decl. at ¶ 22. According to Lloyd, the deal fell apart in large part because Steve Moore was insistent upon a long-term supply contract as part of the deal, while representative of the Tribe indicated the Tribe would not agree to a long term contract. *Id*. at ¶ 23.

Negotiations with the Tribe were then interrupted by several intervening events, including a dispute between the Tribe and one of Thomas Petroleum's executives over monies collected from the Tribe by Thomas Petroleum's predecessor. In the fall or winter of 2010, Lloyd again advised Thomas Petroleum that there might be a renewed possibility to re-open the negotiations from the proceeding summer. *Id*. at ¶ 28. According to Lloyd, Steve Moore again told Lloyd that Thomas Petroleum would only be interested if a long-term supply deal could be reached. *Id*. Lloyd understood Moore's instructions to mean that Thomas Petroleum would not be interested in a deal that did not include a long term contract. Moore viewed Thomas Petroleum's position differently, indicating that he would have been willing to entertain a shorter term deal. Moore Depo. at 86-89.

This is a classic dispute over a material fact. If Lloyd's version of the events is believed, he did not unlawfully compete with Thomas Petroleum; he took advantage of an opportunity his employer was not willing to entertain. Critically, "[t]he determination of the particular factual circumstances under which a fiduciary takes business opportunities for himself and the application of the ethical standards of fairness and good faith required from a fiduciary to [a] set of facts is mainly for the trier of fact[]."

12

*Industrial Indem.,* 117 Cal. App. 2d at 534.

        **b.**        **LADWP Opportunity.**

The factual backdrop for the LADWP opportunity is different, but the disputes are just as real. It is undisputed that in early 2011, Lloyd recommended that Thomas Petroleum submit a bid for LADWP project bid 242. JSUF 51 & 52. On Thomas Petroleum's time, using Thomas Petroleum equipment, Lloyd drafted a bid on Thomas Petroleum's behalf for bid 242. JSUF #58. However, Lloyd did not submit the bid for Thomas Petroleum. JSUF #61. Instead, he and his daughter signed the $1.15 million bid and submitted it for E.S. Oil. JSUF #63-65.

Lloyd has submitted evidence that, if believed, at least partially explains his actions. It appears to be undisputed that he possesses extensive experience preparing bids for LADWP. JSUF #54; Lloyd Decl. ¶ 35. According to Lloyd, LADWP is "very particular about certain things in the bidding process," including "that an officer of the business entity submitting the bid sign it, and that the bid be sealed [i.e. that it bear a corporate seal] or otherwise contain some indication that the corporation (or other business entity) is binding itself to the terms of the bid." Lloyd Decl. at ¶ 38. Without these things, LADWP is likely to reject the bid before even considering its content. *Id.*

As described above, Lloyd encountered consistent resistance from Moore to his requests for signatures and a corporate seal. Because Moore repeatedly failed to assist Lloyd, Lloyd interpreted this as an indication that Thomas Petroleum did not want to compete for the business. *Id.* As a result, Lloyd prepared a bid on behalf of E.S. Oil. *Id.* at ¶ 46. Lloyd claims to have prepared the E.S. Oil bid on his own time. *Id.* Lloyd also claims he "waited until the day of the submission deadline" to submit the bid on behalf of E.S. Oil, LLC, hoping until that time to receive appropriate signatures from Thomas Petroleum. *Id.* at 48.

If Lloyd's version of these disputed events is believed, which the Court must assume on summary judgment, his submission of the bid on behalf of E.S. Oil is also an example of an employee

advantage of an opportunity his employer was not willing to entertain.

### c.     Nella Oil Communications.

Thomas Petroleum also argues that Lloyd's communications with senior managers at Nella constitute a breach of the duty loyalty. It is undisputed that Lloyd reached out to Nella in February 2011 to say he was thinking about "going out on his own." Deposition of Bob Prary at 30-31. It is also undisputed that Lloyd met with senior managers at Nella to set up an account for E.S. Oil. JSUF #44-45. Several weeks before Lloyd resigned in early May 2011, Lloyd informed Nella he would send Nella a "list of top customers" and the contract Lloyd now had with the Paiute Tribe. JSUF #46.

Lloyd does not directly address this argument in his papers. However, on the existing record, assuming Lloyd's conduct in connection with the Paiute and LADWP opportunities was lawful, the Court cannot conclude that these facts constitute an independent breach of the duty of loyalty

### d.     Lease Transfer.

Finally, Thomas Petroleum complains that Lloyd breached his duty of loyalty by "secretly negotiating the E.S. Oil Lease to substitute E.S. Oil for Thomas Petroleum as tenant." Doc. 22-1. The undisputed facts establish that Lloyd in fact did secretly renegotiate Thomas Petroleum's lease to substitute E.S. Oil as the tenant. Under the old lease, Thomas Petroleum paid $2,387 per month in rent. JSUF # 70. The new lease that named E.S. Oil as the tenant set rent at $2,400 per month. JSUF #68..

Assuming this conduct constitutes a breach of the duty of loyalty, Plaintiff has not established the third element of its claim: damage proximately caused by that breach. *See Huong Que*, 150 Cal. App. 4th at 410. Thomas was not required to vacate its premises and was not required to pay additional rent while E.S. Oil was the tenant. Thomas Petroleum argues it was economically harmed by this course of events because it had to sign a new lease with a slightly higher base rent and escalation clause. Over the ten year life of the lease, Thomas Petroleum estimates it will pay $30,000 more than it would have

had the rent remained steady at $2,387. However, to conclude Thomas will suffer $30,000 in damages due to Defendants' breach requires assumption of a fact not in evidence, namely that the rent would have remained steady at $2,387 for the life of the lease. In light of the absence of evidence on this issue and the fact that one of Thomas' own witnesses admitted it was not harmed financially by Lloyd's conduct in connection with the lease, *see* John Saxon Deposition at 178, the Court is unable to enter judgment in favor of Thomas on the present record.

Thomas Petroleum's motion for summary judgment on its duty of loyalty claim is DENIED IN ITS ENTIRETY.

**B.   RICO (Cause of Action 1).**

The Racketeer Influenced and Corrupt Organizations Act ("RICO") exposes to civil liability any individual or entity "employed by or associated with any enterprise" who conducts a "pattern of racketeering activity," or conspires to do so. 18 U.S.C. §§ 1962 (c), (d). Although the complaint contains claims under both § 1962(c) and (d), Plaintiff moves for summary judgment only on its § 1962(c) claim, which requires: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co.* 473 U.S. 479, 495 (1985).

**1.     Conducting an Enterprise.**

An "enterprise" is "any individual, partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4). The definition is "not very demanding" and "fairly straightforward." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007). One "conducts" an enterprise by taking some part in directing its affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993). It appears to be undisputed that Lloyd's conduct in connection with E.S. Oil satisfies this element.

**2.     Pattern of Racketeering Activity.**

Liability for a violation of RICO requires a showing of a "pattern" of two or more "predicate

acts." 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To qualify as a

"predicate act," a particular act must be enumerated in 18 U.S.C. § 1961(1), which includes mail and/or

wire fraud. The essential elements of mail or wire fraud are (1) use of the mails or wires in furtherance

of (2) a scheme or artifice to defraud. 18 U.S.C. §§ 1341, 1343. Plaintiff points to 18 U.S.C. § 1346,

which defines a "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the

intangible right of honest services." Presumably Plaintiff is suggesting that the conduct discussed in the

context of the duty of loyalty claim was a "scheme or artifice to deprive" Thomas Petroleum of "the

intangible right of honest services."

It is here that Plaintiff demonstrates a profound ignorance of modern RICO jurisprudence. In

2010, the United States Supreme Court examined the conviction of Jeffrey Skilling, a former Enron

executive, who was convicted of a conspiracy to defraud Enron's shareholders of their right to his

honest services "by misrepresenting the company's fiscal health, thereby artificially inflating its stock

price," and benefitting financially because his compensation was tied to the performance of Enron's

stock. *Skilling v. United States*, 130 S.Ct. 2896, 2934 (2010). The issue was "whether Skilling's

conspiracy conviction was premised on an improper theory of honest-services wire fraud." *Id*. at 2925.

Skilling argued that § 1346 was unconstitutionally vague and, alternatively, that his conduct did not fall

within the statute's reach. *Id*. Instead of invalidating the statute, the Supreme Court held it

"encompass[es] only bribery and kickback schemes." *Id*. at 2933. This effectively dooms any civil

RICO claim premised upon an honest services mail or wire fraud claim, unless a bribery or kickback

scheme is alleged. *See Hope For Families & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1121-22

(M.D. Ala. 2010); *see also Wallace v. Powell*, 2010 WL 3398995 (M.D. Pa. Aug. 24, 2010) (applying

*Skilling* limitation to Civil RICO action). Plaintiff does not allege any conduct that would even arguably

fall within *Skilling*'s bounds.

Moreover, even if *Skilling* did not operate to bar a mail or wire fraud claim based upon the

conduct of an employee who acted in contravention of the duty of loyalty by unlawfully competing

against his employer through the use of the mails or wires, the current record would not permit summary

judgment. There are disputes over material facts in connection with all of the purported breaches of the

duty of loyalty alleged by Thomas Petroleum.

Plaintiff's motion for summary judgment on its RICO claim is DENIED.

**C.**   **Misappropriation of Trade Secrets (Cause of Action 5).**

Plaintiff requests summary judgment on its misappropriation of trade secrets claim.

Misappropriation of trade secrets is an intentional tort defined in California's Uniform Trade Secrets

Act, Cal. Civil Code § 3426.1 (b), which explains that "misappropriation" can occur in several ways,

including: (1) when a person acquires a trade secret and knows or has reason to know that the trade

secret was "acquired by improper means"; Cal. Civil Code § 3426.1 (b)(1); when a person discloses or

uses a trade secret without consent after having used improper means to acquire that trade secret, Cal.

Civil Code § 3426.1 (b)(2)(A); or (3) when a person discloses or uses a trade secret without consent and

at the time of disclosure or use knew or had reason to know that his or her knowledge of the trade secret

was "(i) [d]erived from or through a person who had utilized improper means to acquire it; [¶] (ii)

[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [¶] (iii)

[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy

or limit its use…." Cal. Civil Code § 3426.1 (b)(2)(B).

Here, Plaintiff argues that Defendant misappropriated its trade secrets by: (1) taking certain

confidential information acquired during his employment at Thomas Petroleum with him after his

resignation; (2) using Thomas Petroleum's confidential information to secure new customers and

negotiate a favorable lease on behalf of E.S. Oil.

Lloyd appears not to contest that he took Thomas Petroleum's confidential information with him

after resigning. The Joint Statement of facts indicates that "when Lloyd left, he took without consent

17

documents containing confidential information, including profit and loss statements, income statement[s], and information related to Thomas Petroleum's 2009 acquisition of Eastern Sierra Oil…" and did not return the information for nearly a year. JSUF # 19. He does dispute whether or not some or all of this information constitutes "trade secrets" by claiming that he possessed, independent of his employment at Thomas Petroleum, considerable information about the oil and gas industry, pricing, available sub-contractors, etc. Information that is generally known in the business community is not a trade secret. *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1543 (2007).

Even assuming the information Lloyd took with him constituted "trade secrets," his possession alone is insufficient to entitle Plaintiff to summary judgment. A misappropriation claim "requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc*., 160 Cal. App. 4th 288, 297 (2008). Thomas Petroleum does not even argue it was harmed by Lloyd's act of merely taking the confidential information with him after resignation and holding it for one year. That Lloyd may have used that information to place a value on Thomas Petroleum's Bishop business in order to offer to buy Thomas Petroleum is of no moment. Thomas Petroleum did not accept Lloyd's bid and does not argue it was harmed in any way by the making of the offer.

As to the second allegation – that Lloyd used Thomas Petroleum's confidential information to secure new customers and negotiate a favorable lease on behalf of E.S. Oil – the record does support a finding that Lloyd used at least some of Thomas' confidential information to prepare the LADWP bid. Lloyd Decl. at ¶ 41 (admitting that he "did not need to, and did not, consult nearly any of Thomas Petroleum's proprietary information," implying that he did consult some of Thomas' proprietary information). Employing confidential information to solicit customers constitutes use. Rest.3d Unfair Competition § 40, com. c. (1995). However, if the trier of fact credits Lloyd's version of events, Thomas

18

Petroleum abandoned the LADWP bid process before Lloyd made use of any trade secrets to prepare E.S. Oil's bid. Thomas cannot claim to be harmed by Lloyd taking advantage of a business opportunity it did not want.

Plaintiff's motion for summary judgment on its misappropriation of trade secrets claim is DENIED.

**D.    Intentional Interference with Prospective Economic Advantage (Cause of Action 7).**

The elements of a cause of action for intentional interference with prospective economic advantage ("IIPEC") are: (1) an economic relationship between plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) defendant's intentional acts designed to disrupt the relationship; (4) actual disruption; and (5) resultant damage. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). To establish a claim for interference with prospective economic advantage, "a plaintiff must plead that the defendant engaged in an independently wrongful act." *Id*. at 1158. "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id*. at 1159.

Plaintiff essentially incorporates by reference its breach of duty of loyalty and misappropriation of trade secrets allegations to establish that Lloyd undertook intentional acts designed to disrupt purported relationships between Thomas Petroleum, the Paiute Tribe, and LADWP. Because there are disputes as to material facts in connection with each of these incorporated claims, Plaintiff's motion for summary judgment on its IIPEC claim is DENIED.

**E.    Conversion of Lease (Cause of Action 8).**

Conversion is the wrongful exercise of dominion over the property of another. *Oakdale Village Group v. Fong*, 43 Cal. App. 4th 539, 543 (1996). Conversion is a strict liability tort that requires proof

of: (1) plaintiff's ownership of or right to possess the property; (2) defendant's conversion by a wrongful

act or disposition of property rights; and (3) damages. *Id.* at 543-44. The tort of conversion can be

applied to a lease. *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 940 (2009). However, for the same

reasons Plaintiff is not entitled to summary judgment on its breach of the duty of loyalty claim based on

Lloyd's conduct in connection with the lease, Plaintiff is not entitled to summary judgment on its

conversion claim. Namely, there is a failure of proof on the damages element. Plaintiff's motion for

summary judgment on its conversion claim is DENIED.

**F.**   **Trademark and Trade Name Infringement.**

　　Plaintiff next moves for summary judgment on a set of federal and state claims for trademark and

trade name infringement: "federal common law trademark infringement" (fifteenth cause of action);

"federal unfair competition" pursuant to 15 U.S.C. § 1125(a) (seventeenth cause of action); "California

statutory and common law trademark infringement" (eighteenth cause of action); and "California

common law unfair competition" (twentieth cause of action). For purposes of summary judgment,

Plaintiff has relied entirely on federal caselaw, noting, correctly, that the California and federal laws are

"reasonably identical" in this area. *Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*, 2002 WL

570681 (E.D. Cal. Mar. 20, 2002).

　　Trademark law aims to protect trademark owners from a false perception that they are associated

with or endorse a product." *Mattel Inc. v. Walking Mt. Prods.,* 353 F.3d 792, 806 (9th Cir. 2003); *New*

*W. Corp. v. NYM Co. of California, Inc*., 595 F.2d 1194, 1201 (9th Cir. 1979) ("Trade-mark and trade

name infringement, or unfair competition, preclude one from using another's distinctive mark or name if

it will cause a likelihood of confusion or deception as to the origin of the goods."). The elements

necessary to establish trademark infringement and unfair competition are the same. *Brookfield Comm.,*

*Inc. v. West Coast Enter. Corp.,* 174 F.3d 1036, 1046 n. 6, 1047 n. 8 (9th Cir. 1999).

　　Federal trademark infringement claims under § 32 of the Lanham Act apply to registered marks,

while unfair competition claims under § 43(a) of the Lanham Act apply to both registered and

unregistered marks and protect against a wider range of practices. *Id.* at 1047 n. 8. As there is no

evidence that Plaintiff ever registered the disputed trademark, this case falls under § 43 of the Lanham

Act. Regardless, Plaintiff must "prove [1] the existence of a trademark and [2] the subsequent use by

another in a manner likely to create consumer confusion." *Comedy III Prod., Inc. v. New Line Cinema,*

200 F.3d 593, 594 (9th Cir. 2000). Put another way, "[t]he traditional elements of a claim for trademark

infringement are ownership of a protectable mark and likelihood of confusion arising from defendant's

use of the mark." *Protectmarriage.com v. Courage Campaign*, 680 F. Supp. 2d 1225, 1228 (E.D. Cal.

2010) (citing *Applied Info. Scis. Corp. v. eBay, Inc.,* 511 F.3d 966, 969 (9th Cir. 2007)).

### 1.   __Ownership of A Protectable Mark.__

Both registered and unregistered marks receive the same protections. *Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 768 (1992). While registration may create a prima facie showing of

ownership, a prior use is sufficient to establish ownership of an unregistered trademark. *Halicki Films,*

*LLC v. Sanderson Sales & Marketing*, 547 F.3d 1213, 1226 (9th Cir. 2008); *see also Sengoku Works*

*Ltd. v. RMC Int'l, Ltd*., 96 F.3d 1217, 1219 (9th Cir.1996) ("It is axiomatic in trademark law that the

standard test of ownership is priority of use.... [I]t is not enough to have invented the mark first or even

to have registered it first; the party claiming ownership must have been the first to actually use the mark

in the sale of goods or services.").

It appears to be undisputed that Haycock, Thomas Petroleum's predecessor, put the

trademark/tradename "Eastern Sierra Oil" to use in 1996 and that Thomas Petroleum acquired the right

to continue to do business under that name in October 2009. JSUF #2. Thomas Petroleum asserts that

this is sufficient to establish ownership over the mark. However, Plaintiff entirely ignores the issue of

"abandonment" raised in this case.

The Lanham Act provides for abandonment as a statutory defense:

A mark shall be deemed to be "abandoned" if either of the following occurs:

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127. "Once held abandoned, a mark falls into the public domain and is free for all to use. While acquiescence may bar suit against one person, abandonment opens rights to the whole world. Abandonment paves the way for future possession and property in any other person." 3 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed.). "Abandonment is an issue of fact, subject to the normal procedural rules governing factual issues…." *Id.*

The bulk of the abandonment caselaw focuses on the presumption of abandonment that occurs after three years of non-use. There is no evidence suggesting such non-use in this case. However, there is authority to support the proposition that trademark can alternatively be <u>intentionally</u> abandoned through an overt act, such as a filing a document formally declaring abandonment of a registered trademark for tax purposes. *See, e.g., Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir. 1980) (where a company deliberately abandons its mark, a new company is free to attempt to acquire it through use); *California Cedar Products Co. v. Pine Mountain Corp.*, 724 F.2d 827, 830 (9th Cir. 1984)(same); *Sutton Cosmetics (P. R.) Inc. v. Lander Co.,* 455 F.2d 285, 286 (2d Cir. 1972)(same); McCarthy § 17:1 ("A trademark can be formally abandoned by a firm and this is sometimes done, apparently for tax write-off purposes….").

Lloyd has presented evidence that there was discussion as early as March 2011 at Thomas Petroleum about whether or not Thomas Petroleum should retain the fictitious business name of Eastern

22

Sierra Oil. Lloyd Decl. at ¶ 16 & Ex. 63. Because Lloyd believed there was value in the name, Lloyd advised Thomas Petroleum that it should renew its registration of the name. *Id.* Despite Lloyd's advice, Thomas Petroleum formally abandoned the fictitious business name "Eastern Sierra Oil" in April 2011 by purposefully deciding not to re-register that name with the County of Inyo. *Id.* at ¶¶ 16, 18. PSUF #45.

Neither party provides any citations to aid the Court's determination of whether this act constitutes formal abandonment of an unregistered trademark and/or trade name, or whether formal abandonment of an unregistered mark is even possible. Viewing the evidence in a light most favorable to the non-moving party, however, the Court will assume Tomas Petroleum's abandonment of the fictitious business name is evidence of intentional abandonment of its unregistered trademark.[9]

According to the federal cases cited above, a formally abandoned mark becomes immediately available to any individual or entity to claim through use. If a formal abandonment occurred in April 2011, it is totally unclear what entity next used the name "Eastern Sierra Oil." As mentioned, Thomas Petroleum formally abandoned "Eastern Sierra Oil" as its fictitious business name in April 2011. PSUF # 45. It then re-filed to do business as Eastern Sierra Oil on May 25, 2011. PSUF #46. However, it is not clear whether such re-filing, on its own, would re-establish Thomas' ownership over the mark. *See* 18 U.S.C. § 1127 ("Use in commerce" means "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."). According to Steve Moore, Thomas Petroleum "never took the name Eastern Sierra Oil off its trucks or signs," *id.*, but were those trucks and signs in use at the time? No details are provided. Instead, Lloyd suggests that he may have put the name "Eastern Sierra Oil" to use, but does not discuss any details of that use.

In sum, viewing the evidence in the light most favorable to Defendant, Thomas Petroleum

---

[9] Thomas Petroleum suggests that, if anything, this act of abandonment is only relevant to its California claim, but fails to provide any relevant citations to explain why any abandonment would not be equally relevant to any unregistered federal "trademark" Thomas Petroleum held in "Eastern Sierra Oil."

formally abandoned its trademark/trade name in April 2011 and has not produced evidence establishing that it was the first to once again put that name to use. Therefore for purposes of summary judgment, Thomas Petroleum has not established post-April 2011 ownership of a trademark in the name "Eastern Sierra Oil."

Regardless, it is undisputed that Thomas Petroleum had protected rights to the unregistered trademark "Eastern Sierra Oil" <u>prior</u> to April 2011. Because most, if not all, of the events material to Thomas Petroleum's infringement claims purportedly took place before April 2011, the issue of confusion must be addressed

2.      **Likelihood of Confusion.**

The Ninth Circuit recently reviewed standards applicable to the issue of confusion on summary judgment:

> [The following] eight factors [are relevant]: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. [*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).]

> It is well established that this multi-factor approach must be applied in a flexible fashion. The *Sleekcraft* factors are intended to function as a proxy or substitute for consumer confusion, not a rote checklist. *See, e.g.,* [*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011)]. In other words, "we do not count beans." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances. *See, e.g., Network,* 638 F.3d at 1142, 1145, 1148–49, 1153–54; *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 631 (9th Cir .2005). For example, this Court has pointed to three factors ("similarity of the marks," "proximity of the goods," and the simultaneous use of the Internet for marketing) as especially important in cases involving similar domain names. *See, e.g., Network,* 638 F.3d at 1148–49. While the "internet trinity" is weighed heavily in domain cases, "it makes * no sense to prioritize the same three factors for every type of potential online commercial activity." *Id.* at 1148–49. On the other hand, evidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a "likelihood of confusion" finding. *See, e.g., Playboy Enterprises, Inc. v. Netscape Communications Corp.,* 354 F.3d 1020, 1026 (9th Cir. 2004). "[T]he result of the consideration of one factor can influence the consideration of another." *Entrepreneur,* 279 F.3d at 1145 n. 9. In the end, "[t]his eight-

factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts." [*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1030 (9th Cir. 2010)] (quoting *Brookfield,* 174 F.3d at 1054).

Given the open-ended nature of this multi-prong inquiry, it is not surprising that summary judgment on "likelihood of confusion" grounds is generally disfavored. We have affirmed summary judgment rulings based on the *Sleekcraft* factors in the past. *See, e.g., Au–Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,* 457 F.3d 1062, 1075 (9th Cir. 2006) ("[I]n cases where the evidence is clear and tilts heavily in favor of a likelihood of confusion, we have not hesitated to affirm summary judgment on this point." (citing *Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d 1002, 1019 (9th Cir. 2004)); *Surfvivor,* 406 F.3d at 630–35. On the other hand, "[w]e have cautioned that district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Thane Int'l, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 901–02 (9th Cir. 2002) (citing *Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1265 (9th Cir. 2001); *Interstellar,* 184 F.3d at 1109), *superseded by statute on other grounds,* Trademark Uniform Dilution Revision Act of 2006, 15 U.S.C. § 1125, *as recognized in Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158 (9th Cir. 2011). In other words, "[b]ecause the likelihood of confusion is often a fact-intensive inquiry, courts are generally reluctant to decide this issue at the summary judgment stage." *Au–Tomotive,* 457 F.3d at 1075 (citing *Thane,* 305 F.3d at 901–02)); *see also, e.g., Fortune,* 618 F.3d at 1039.

*Rearden LLC v. Rearden Commerce, Inc*., 683 F.3d 1190, 1209-10 (9th Cir. 2012).

Thomas Petroleum alleges two types of infringing use by Lloyd. First, Thomas Petroleum complains that Lloyd's use of the name "E.S. Oil" infringed upon its trademark/tradename "Eastern Sierra Oil." Second, Thomas alleges Lloyd's made us of the complete name "Eastern Sierra Oil" in (a) the LADWP bid, filed in early March 2011, and (b) an email to an Inyo County supervisor, and that this use infringed upon its own trademark/tradename. The *Sleekcraft* factors will be evaluated separately for each category of use.

### a.    Defendants' Use of the Business Name E.S. Oil.

It is undisputed that Lloyd used the business name "E.S. Oil" to transact business before April 2011. Among other things, he negotiated and executed the contract with the Paiute Tribe in the name of that business.

**(1)**     <u>**Strength of the Mark.**</u>

Neither party addresses this factor.

**(2)**     <u>**Proximity of the Goods.**</u>

Plaintiff briefly addresses this factor, pointing out the obvious: two companies operating in the same small city in Eastern California offer goods in close proximity to one another.

The "proximity of goods" factor is also used as an opportunity to evaluate the relatedness of the goods themselves. "Related goods are more likely than non-related goods to confuse the public as to the producers of the goods." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (internal citation omitted). "A diminished standard of similarity is therefore applied when comparing the marks of closely related goods." *Id*. Again, Plaintiff points out the obvious: both Thomas Petroleum and E.S. Oil offer petroleum products for sale. Therefore, a diminished standard of similarity applies here.

**(3)**     <u>**Similarity of the Marks**</u>

"Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1206 (9th Cir. 2000). The Ninth Circuit has applied "three axioms" to the similarity analysis: "1) [m]arks should be considered in their entirety and as they appear in the marketplace; 2) [s]imilarity is best adjudged by appearance, sound, and meaning; and, 3) [s]imilarities weigh more heavily than differences." *Id*. How a mark appears in a logo is relevant to the analysis, as is how a mark reads in plain text or spoken language. For example, when evaluating the degree of similarity between the marks "Entrepreneur" and "Entrepreneur Illustrated," the Ninth Circuit separately compared logos used to depict the marks and the words associated with the marks (i.e. how the words would appear in type or in spoken language). *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1145 (9th Cir. 2002).

Thomas Petroleum has failed to present evidence in its summary judgment motion of how their mark appears in a logo or is otherwise presented in the marketplace. Nor has Plaintiff provided evidence

of how Defendants presented the name "E.S. Oil" in any logo to potential consumers. Nevertheless, it is still possible to do a textual analysis. In *Entrepreneur Media*, the Ninth Circuit concluded a reasonable fact finder could find the plain text of the two competing marks dissimilar because "Entrepreneur Illustrated" contains an entire four-syllable word that "Entrepreneur" does not, making the mark "Entrepreneur Illustrated" almost twice as long-to the eye and the ear-as the mark "Entrepreneur." *Id.*; *see also Gruner & Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993) (affirming district court's ruling that the magazine title "Parent's Digest" was not similar to the magazine title "Parents" and noting that "the only similarity concerned the use of the word 'parent'").[10] In this context, it cannot be said as a matter of law that E.S. Oil is "similar" to Eastern Sierra Oil.

### (4)    Evidence of Actual Confusion.

"Evidence of actual confusion is strong evidence that future confusion is likely...." *Official Airline Guides,* 6 F.3d at 1393. Here, Thomas presents evidence of actual confusion on the part of five individuals: Lloyd's landlord, fuel supplier, former boss, girlfriend, and daughter. In each case, the witnesses testified that the "E.S." in "E.S. Oil" stood for "Eastern Sierra." PSUF #49. Lloyd does not dispute that these witnesses so testified, but objects that the evidence is irrelevant because none of these witnesses are customers. "In assessing the likelihood of confusion to the public, the standard used by the court is the typical buyer exercising ordinary caution." *Sleekcraft,* 599 F.2d at 353. Moreover, a trier of fact may discount "*de minimis*" evidence of confusion, because "[t]o constitute trademark infringement, use of a mark must be likely to confuse an <u>appreciable</u> number of people as to the source of the product." *Entrepreneur Media*, 279 F.3d at 1150-51 (quoting *Int'l Ass'n. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 201 (1st Cir.1996) ("[T]he law has long

---

[10] Plaintiff failed to cite any of this contrary authority in discussing the similarity of its mark "Eastern Sierra Oil" to Lloyd's business name "E.S. Oil." Doc. 22-1 at 21.

demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.").

Although a trier of fact would likely find the testimony relevant to the confusion issue, these witnesses are not "purchasers" of petroleum products. Moreover, although the witnesses testified they believed "E.S." stood for "Eastern Sierra," they did not specifically testify that they confused "E.S. Oil" with "Eastern Sierra Oil." This evidence is not particularly compelling as to the confusion issue.

### (5)    **Marketing Channels.**

"Convergent marketing channels increase the likelihood of confusion." *Official Airline Guides,* 6 F.3d at 1394. "Marketing channels" refers to the methods and/or places a company uses to market their product. *See Groupion, LLC v. Groupon, Inc.,* 826 F. Supp. 2d 1156, 1164 (N.D. Cal. 2011).

Although Plaintiff's motion includes a heading that purports to address the marketing channels used by the parties, it does not. Doc. 22-1 at 22. Rather, it discusses only the similarity of the goods and the closeness/identity of the marketplace. Neither party has discussed the marketing channels used by the parties in this case.

### (6)    **Type of Goods and the Degree of Care the Purchaser Will Likely Exercise.**

The parties do not address this factor, but the Court notes that the two actual customers at issue in this case – the Paiute Tribe and LADWP – appear from the record to be sophisticated purchasers with extensive knowledge of the players in this case.

### (7)    **Defendants' Intent.**

If an infringer "adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, [his] intent may be sufficient to justify the inference that there are confusing similarities." *Pac. Telesis v. Int'l Telesis Comms*., 994 F.2d 1364, 1369 (9th Cir. 1993). Thomas Petroleum does not present any evidence of Lloyd's intent with respect to his choice of the

name "E.S. Oil."

**(8)**    **Expansion of Business.**

"A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. Here, it is undisputed that Defendants are already in competition with Plaintiff in the Bishop marketplace.

**(9)**    **Evaluation of the Sleekcraft Factors in Connection with Lloyd's use of the Business Name E.S. Oil.**

Considering all the factors discussed above, although there is some undisputed evidence tending to establish confusion (e.g., proximity of the goods and expansion), but weighing several other factors is either impossible (due to the absence of evidence) or rendered impermissible on summary judgment due to disputed evidence. Most importantly, although "E.S. Oil" bears some textual similarity to "Eastern Sierra Oil," the caselaw suggests the similarity may not be strong enough to justify a finding of similarity for trademark purposes. In addition, the evidence of actual confusion offered by Plaintiff is weak at best. Particularly in light of the fact that summary judgment should be granted sparingly in cases like this because likelihood of confusion is often a fact-intensive inquiry, Plaintiff's motion for summary judgment as to Defendants' use of the name "E.S. Oil" is DENIED.

**b.**    **Defendants' Use of "Eastern Sierra Oil."**

**(1)**    **Use of "Eastern Sierra Oil" in Email to Inyo County Supervisor.**

It is undisputed that Lloyd used the name "Eastern Sierra Oil" in an email to an Inyo County Supervisor asking him to wield influence on behalf of Lloyd and "Eastern Sierra Oil" in connection with a particular customer. PSUF #36. However, there is absolutely no evidence that this constituted a "use likely to create consumer confusion." *See Comedy III*, 200 F.3d at 594. There is no evidence that the County Supervisor did anything with that email request. In fact, the potential customer did not switch its business to E.S. Oil. Plaintiff's motion for summary judgment is DENIED as to this use.

(2)     Use of "Eastern Sierra Oil" in the LADWP Bid.

It is also undisputed that E.S. Oil made use of the name Eastern Sierra Oil in its bid to LADWP. JSUF #64. The bid was signed on March 11, 2011, before any formal abandonment. Although the record is not entirely clear, it appears the bid was also submitted to LADWP at some point in March 2011. *See* Defendant's response to PSUF #19. Again, this was before any possible formal abandonment.

Defendants do not dispute that this use took place in March 2011. They only note that at that time "Lloyd had been advised that Thomas Petroleum's policy was to not use fictitious business names such as "Eastern Sierra Oil." Resp. to PSUF #19. However, there is no evidence that any actual formal/deliberate abandonment took place before April 2011. In the absence of formal abandonment, Defendants would have had to demonstrate that Thomas Petroleum effectively abandoned its trademark through non-use, which normally requires a showing of three consecutive years of non-use. No such evidence has been presented. Therefore, Plaintiff possessed a protected interest in the trademark/tradename "Eastern Sierra Oil" when Defendants used those words in the LADWP bid.

The next step is to evaluate the *Sleekcraft* factors for Defendants' use of "Eastern Sierra Oil" in the LADWP bid. Again, the strength of the mark, marketing channels, and type of goods/degree of care factors are not discussed by any party. As with the analysis above, the proximity of the goods and expansion of business factors weigh in favor of a finding of confusion, as both competitors offer petroleum products for sale in the same market.

There can be no dispute about the similarity of the marks. In the context of a bid, the typewritten appearance of "Eastern Sierra Oil" as used by Defendants would be identical to the typewritten appearance of Plaintiff's mark. Although there is no evidence directly from LADWP regarding any confusion, the lack of evidence of actual confusion is not dispositive. *Official Airline Guides, Inc. v. Goss*, 6 F.3d at 1393.

If an infringer "adopts his designation with the intent of deriving benefit from the reputation of

30

the trade-mark or trade name, [his] intent may be sufficient to justify the inference that there are confusing similarities." *Pac. Telesis*., 994 F.2d at 1369. As mentioned above, Thomas Petroleum argues this factor should weigh in favor of summary judgment because Lloyd admitted he filed on E.S. Oil's behalf to do business as "Eastern Sierra Oil" when Thomas Petroleum abandoned that fictitious business name because "there was value in the name." This tends to suggest that even Defendants' believed the use of "Eastern Sierra Oil" would garner a benefit from the reputation of the trademark.

In sum, several factors weigh in favor of a finding of likelihood of confusion and none weigh against such a finding. Defendants do not even bother to contest the likelihood of confusion as to this use. "[W]here the evidence is clear and tilts heavily in favor of a likelihood of confusion," a Court should not hesitated to enter summary judgment. *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006). Accordingly, Plaintiff 's motion for summary judgment on its trademark claims as to Defendants' use of the name "Eastern Sierra Oil" in the LADWP bid is GRANTED. Relief, however, is not addressed by the present motion.

**G.      Unjust Enrichment (Cause of Action 14).**

A claim of unjust enrichment requires proof that defendant received a benefit as well as that defendant unjustly retained the benefit at plaintiff's expense. *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). Here, Plaintiff claims Defendants were unjustly enriched when Lloyd: (1) diverted business (and profits) from Thomas Petroleum's two biggest and most profitable customers (the Paiute Tribe and LADWP); (2) did not repay Thomas Petroleum for the rent it paid on E.S. Oil's Lease; and (3) collected wages and commissions from Thomas Petroleum while he was actually working for his own benefit in an attempt to divert business for himself. Summary judgment cannot be entered on the basis of any of these theories. If the evidence presented by Lloyd is believed, Lloyd did not divert business from Thomas Petroleum; rather, he took advantage of a business opportunity Thomas was unwilling or unable to exploit. There is no evidence that Thomas Petroleum at any time was unable to benefit from the use of

31

the facility premises in Bishop while E.S. Oil was the tenant. Therefore, it is unclear on what basis, if any, Thomas Petroleum is entitled to reimbursement of the portion of the lease payments it made. Finally, it is disputed whether Lloyd prepared either of the disputed bids on Thomas' time. He maintains that he did not.

Plaintiff's motion for summary judgment on its unjust enrichment claim is DENIED.

**H.** **Unfair Competition (Cause of Action 9).**

California's unfair competition statute prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The law's scope is "broad" and "sweeping, embracing anything that can properly be called a business practice and at the same time is forbidden by law." *Cal-Tech Comms., Inc. v. Los Angeles Cellular Tel*. Co., 20 Cal. 4th 163, 180 (1999). Plaintiff incorporates by reference its duty of loyalty, trade secret misappropriation, tortious interference, unjust enrichment, and trademark infringement claims as the requisite unlawful predicate act for purposes of the unfair competition law.

As to any unfair competition claim based upon the duty of loyalty; trade secret misappropriation; tortious interference; trademark claims based upon Defendant's use of the business name "E.S. Oil" or the email to the Inyo County supervisor; and/or unjust enrichment claims, Plaintiff's motion for summary judgment on its unfair competition claim is DENIED, because summary judgment has been denied on the predicate claims.

Unfair competition under § 17200 is established where a plaintiff demonstrates that it has a valid, projectile trademark and that the use of the defendant's mark creates a likelihood of confusion with plaintiff's mark. *See Grupo Gigante S.A. de C.V. v. Dallo & Co ., Inc.*, 119 F. Supp. 2d 1083, 1088 (C.D. Cal. 2000), *rev'd on other grounds*, 391 F.3d 1088, 1095 (9th Cir. 2004). The Ninth Circuit has explained that such claims "substantially congruent" to claims made under the Lanham Act. *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.

1991). Because the Court has granted Plaintiff's motion for summary judgment that Defendants' use of the name "Eastern Sierra Oil" in the LADWP bid constituted trademark infringement/unfair competition claim under the Lanham Act it follows that plaintiff is also entitled to summary judgment as to its unfair competition claim under § 17200. *Phat Fashions*, 2002 WL 570681, *12 n.7.

## V. **CONCLUSION**

For the reasons set forth above, Plaintiff'smotion for summary judgment is:

(1) DENIED as to its duty of loyalty claim;

(2) DENIED as to its civil RICO claim;

(3) DENIED as to its misappropriation of trade secrets claim;

(4) DENIED as to its tortious interference claim;

(5) DENIED as to its conversion claim;

(6) GRANTED IN PART AND DENIED IN PART as to its federal and state trademark and unfair competition claims;

(7) DENIED as to its unjust enrichment claim; and

(8) GRANTED IN PART AND DENIED IN PART as to its § 17200 unfair competition claim.

**SO ORDERED**
**Dated: October 2, 2012**

**/s/ Lawrence J. O'Neill**
**United States District Judge**